# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DEBORAH A. BECKWITH,      )
                            )
       Plaintiffs,      )
                            )
       v.              )     Civil No. 3:18-40
                            )     Judge Stephanie L. Haines
BLAIR COUNTY, PRIMECARE   )
MEDICAL, INC., MICHAEL      )
JOHNSTON and RANDY POLLOCK,  )
                            )
       Defendants.     )

## OPINION

On October 24, 2016, Samantha Beckwith, a pretrial detainee, committed suicide in her cell while incarcerated at the Blair County Prison. Deborah A. Beckwith ("Plaintiff"), as Administratrix of the Estate of Samantha Beckwith, has brought this action against Defendants Blair County (operating as the Blair County Prison), PrimeCare Medical, Inc., Warden Michael Johnston and Deputy Warden Randy Pollock, alleging violations of the Civil Rights Act, 42 U.S.C, § 1983, the Pennsylvania Wrongful Death Act, 42 Pa.C.S.A. § 8301, and the Pennsylvania Survival Act, 42 Pa.C.S.A. § 8302.

Two separate motions for summary judgment pursuant to Federal Rule of Civil Procedure 56(a) were filed by Defendants PrimeCare Medical, Inc. ("PrimeCare") [Doc. 53] and Blair County, Michael Johnston and Randy Pollock (the "County Defendants") [Doc. 56], along with numerous responses [Docs. 60, 62], replies [Docs. 63-1 and 65-2], and sur-replies [Docs. 70, 71]. The Court heard oral argument on the motions on March 3, 2020. By order dated September 30, 2021, the motions were denied. This Opinion setting forth the reasons for the denials now follows.

I.     **Introduction**

A.     **Procedural History**

Plaintiff filed the operative amended complaint [Doc. 11] on March 27, 2018, advancing various claims under § 1983 against Blair County [Count I], Johnston [Count II], Pollock [Count III] and PrimeCare [Count IV].   The amended complaint also advances state law claims against PrimeCare under the Pennsylvania Survival Act and Wrongful Death Act for professional negligence [Counts V and VI, respectively] and for corporate negligence [Counts VII and VIII respectively].[1]

PrimeCare responded to the amended complaint with a partial motion to dismiss and a motion to strike on April 9, 2018 [Doc. 15].   The County Defendants filed an answer to the amended complaint on May 9, 2018 [Doc. 23].   On May 11, 2018, the Honorable Kim R. Gibson[2] entered an order granting in part and denying in part PrimeCare's motion to dismiss and denying in whole the motion to strike.   The Court dismissed the § 1983 claim set forth in Count IV only to the extent that it asserts a Fourth Amendment violation.   The remaining § 1983 claims set forth in Count IV, as well as all other claims, were allowed to proceed  [Doc. 24].   PrimeCare then filed an answer to the amended complaint on May 24, 2018 [Doc. 25].

Following the close of discovery, PrimeCare [Doc. 53] and the County Defendants [Doc. 56] filed separate motions for summary judgment on October 1, 2019, along with a joint concise statement of material facts [Doc. 55].   Plaintiff filed separate responses to the summary judgment

---

[1]   The counts set forth in the amended complaint are incorrectly numbered, with three separate counts listed as Count III and two others listed as Count V.   For clarity, the Court has renumbered the eight counts in the order that they appear in the amended complaint.

[2]   This case was reassigned to this member of the Court on October 25, 2019 [Doc. 59].

motions [Docs. 60, 62].    After both PrimeCare [Doc. 63-1] and the County Defendants [Doc. 65-2] filed replies to Plaintiff's responses, Plaintiff filed a pair of sur-replies [Docs. 70, 71].    Plaintiff was granted leave to file a concise counter-statement of material facts [Doc. 69-1], to which the Defendants filed a response [Doc. 73].

On March 3, 2020, the Court heard oral argument on the summary judgment motions and took the matter under advisement.    On September 30, 2021, the motions for summary judgment were denied [Doc. 80].    This opinion now follows.

**B.**    **Factual Background[3]**

Between May 24, 2012, and March 16, 2016, Samantha Beckwith was incarcerated in the Blair County Prison ("BCP") on ten occasions, ranging in length from several days to nine months [Doc. 57-3 at 76].    Chart notes contained within PrimeCare medical records show that Samantha was placed on suicide watch on seven occasions, and mental health observation on another occasion, during these prior incarcerations [Doc. 57-2 at 13-45].    Chart notes also record an instance on January 21, 2015, when Samantha hid a suicide letter in a toilet and told officers at the BCP that she wanted to commit suicide, but changed her mind [Doc. 57-2 at 14-15].

On October 3, 2016, Samantha began another incarceration at the BCP when she was booked on a technical probation violation at around 5:00 a.m. [Doc. 57-1 at 3].    On intake, she was screened by Corrections Officer Crystal Beegle using a PrimeCare "Intake Suicide Screening" Form [Doc. 57-3 at 78].    The form instructs that if the detainee receives a total of 8 or more checks from a series of factors based on the observations of the transporting officer, personal data obtained through questioning, and appearance and behavior, the detainee is to be placed on suicide watch

---

[3]  The facts set forth in this section are undisputed unless otherwise noted.

[*Id.*]. Samantha was not placed on suicide watch by Officer Beegle, as she received only one check for appearing to be under the influence of alcohol or drugs [*Id.*].

Samantha next underwent a receiving screening from PrimeCare conducted by John Reader, LPN, at 11:18 a.m., which included a second suicide screening [Doc. 57-2 at 2-3].   This second screening was conducted pursuant to PrimeCare's Suicide Prevention Policy, which has been adopted by BCP at its own policy [Docs. 57-4; 57-15].   The form used by Nurse Reader similarly instructs that if the patient receives a score of 8 or more based on observation, personal data and appearance and behavior, a suicide watch is to be initiated [Doc. 57-2 at 2].   Under the personal data section of the suicide screening form, it is noted that Samantha has a history of drug and alcohol abuse [Doc. 57-2 at 2].   It also indicates, incorrectly, that she had not attempted suicide previously [*Id.*].   Answers of "no" are recorded for all other criteria, including "patient is thinking of killing him/herself" and for "patient feels that there is nothing to look forward to in the future (feelings of hopelessness and helplessness)" [*Id.*].   Based on the screening results, Samantha was not placed on suicide watch.   However, Nurse Reader did place her on mental health observation status due to prior mental health treatment [Doc. 57-2 at 4].[4]

The receiving screening form indicates that Samantha reported a history of drinking alcohol heavily (three or more times a week), using heroin seven days a week, using depressants seven days a week, and using opiates/narcotics three or more times a week [Doc. 57-2 at 5-6].   It further is noted that Samantha was currently taking suboxone as a medication [*Id.* at 6].   However, there is no indication that she was taking any psychotropic medications when she entered BCP on October 3, 2016, and, based on pharmacy records, it appears that Plaintiff last had been prescribed

---

[4] Psychiatric observation involves observing the patient at staggered intervals not to exceed thirty minutes in length.   Individuals on psychiatric observation are reviewed daily Monday through Friday by mental health staff [Doc. 57-4].

a seven-day supply of lorazepam on May 15, 2016 [Doc. 57-5].[5]  At intake, verbal orders for alcohol and opiate detox were requested by Cortni McClain, LPN, and given by Cindy Cunningham, PA-C [Doc. 57-3 at 88].  These medications included Bentyl, folic acid, tapering doses of Librium, magnesium oxide, a multi-vitamin, Ondansetron, Pepto-Bismol, Thiamine, and a tapering dose of Vistaril [Doc. 57-3 at 94-96].

After medical intake, Samantha underwent a mental health assessment by Ashley Simmers, a mental health clinician [Doc. 57-3 at 79-80].  The mental health assessment form completed by Simmers indicates that Samantha was requesting detox medications [*Id.* at 79].  The report indicates that Samantha denied any mental health treatment or medications since her last incarceration [*Id.*].  The report further indicates that Samantha denied any suicide attempts or suicidal ideation since her last incarceration, and denied any current suicidal ideation [*Id.*].  Simmers' plan was to continue with the mental health observation and to continue to monitor Samantha and her detox [*Id.* at 86].

Simmers evaluated Samantha again on October 4, 2016, and reported no indications of any current suicidal ideation and noted no distress, but indicated physical symptoms of withdrawal [Doc. 57-3 at 85].  Following another evaluation on October 5, Simmers reported no indications of current suicidal ideation, no distress, and improvement in physical withdrawal symptoms [*Id.*

---

[5]  Plaintiff indicates that she is "without sufficient knowledge as to admit or deny" these averments as set forth in the Defendants' Joint Concise Statement of Material Facts.  She notes that the Defendants merely have presented a "litany of medications" that Samantha was prescribed in 2016 and that it is unknown whether she was prescribed psychotropic medications in the five months leading up to her incarceration [Doc. 69-1 at 7].  However, Plaintiff admits that Samantha identified the Thompson Pharmacy as the pharmacy where she obtained her medications, and the records from Thompson support Defendants' statement of fact.  Plaintiff has not submitted any evidence to suggest that Samantha obtained medications from any other pharmacy or that she was prescribed any psychotropic medications other than those listed in the Thompson Pharmacy records between May and October of 2016.

at 84].  Simmers' plan was to continue Samantha on mental health observation and to continue to monitor her [*Id.*].  On October 6, Simmers evaluated Samantha for possible discharge from mental health observation [*Id.*].  Simmers again reported no indication of any current suicidal ideation, noted no distress, and, although there still were some physical withdrawal symptoms, she was adjusting well [*Id.*].  As a result, Samantha was discharged from mental health observation [*Id.*].

A follow-up evaluation was conducted by Simmers on October 11, 2016, after Samantha requested a sick call indicating "I need medication" [Doc. 57-3 at 83].  Samantha denied suicidal ideation but requested to see a psychiatrist for medication [*Id.*].  The record indicates that Samantha was grieving the death of her cousin and indicates that she reported "I don't want to die or anything. I'm just depressed" [*Id.*].  Simmers noted no indications of any current suicidal ideation but did note symptoms of anxiety and depression [*Id.*].  Simmers plan was to continue periodic follow-ups and that she will "consider referral to psych. in future" but she wanted Samantha "to have at least 1 mos. clean" [*Id.*].

Another follow-up evaluation took place on October 14, 2016, after Samantha submitted a mental health sick call request indicating "I need to talk" [Doc. 57-3 at 82].  Simmers' report indicates that Samantha denied any suicidal ideation but asked for medication because she was having trouble sleeping and her moods were going up and down [*Id.*].  Simmers' assessment was that there were no indications of suicidal ideation and she noted no distress [*Id.*].  Simmers further indicates that many outside stressors were contributing to Samantha's symptoms and that her symptoms likely were increased due to the withdrawal period, and noted it was "difficult to differentiate her mental health symptoms within withdrawal period" [*Id.*].  Simmers did note that Samantha seemed to benefit from talking therapy, and recommended continued weekly follow-ups [*Id.*].

On October 18, 2016, Simmers evaluated Samantha on a one-week follow-up from the October 11 assessment [Doc. 57-3 at 82]. The record shows that Samantha reported that "I'm still depressed," that she was having trouble sleeping, and that she would think about her cousin, uncle, mother, and deceased loved ones when she closes her eyes [*Id.*]. The report indicates that Samantha again asked about medication [*Id.*]. In her assessment, Simmers noted no indications of any current suicidal ideation, but reported she still had underlying mental health symptoms, as well as a long history of such symptoms [*Id.*]. She further reported that Samantha was "currently without medication" but noted she was "noncompliant in the community" [*Id.*]. Simmers plan was to refer Samantha to the psychiatrist for a medical evaluation and to follow-up with mental health in two-weeks [*Id.*].

Simmers evaluated Samantha again on October 21, 2016, after she submitted a sick call slip indicating "I need to talk to Ashley ASAP" [Doc. 57-3 at 81]. The report indicates that Samantha again asked for medication as she was having anxiety [*Id.*]. Samantha also reported that she did not like the cell she was in and had asked to be moved, but her request had not been approved [*Id.*]. In her assessment, Simmers noted no indications of any current suicidal ideation, but did report symptoms of anxiety and some disruption in functioning [*Id.*]. Simmers again noted Samantha's long history of mental health symptoms and that "medication is indicated," and that she wanted her "to have increased amt. of sobriety before referred to psychiatrist" [*Id.*]. Her plan was to follow-up with mental health evaluation in two week and noted that Samantha was "scheduled to be seen via telemed 10/26" [*Id.*]. Simmers testified at her deposition that she did not place Samantha on any type of mental health observation or suicide watch because she did not believe it was indicated [Doc. 57-6 at 20-21].

On October 20, 2016, Samantha submitted an "Inmate Request Form" directed to Deputy Warden Pollock asking to be transferred to Allegheny County [Doc. 57-1 at 5]. Her request was denied "as no detainer is showing for you" [*Id.*]. Pollock spoke to Samantha on October 21 when he returned the form to her and testified that she "never said anything to indicate that she may harm herself" [Doc. 57-1 at 12]. At this time, Samantha was housed in Cell K-22 with two other inmates, and she was not on a special watch or lock-up [Doc. 57-14 at 3].

On Saturday, October 22, 2016, Samantha was moved to Cell K-17 with three other inmates, and she was not placed on any type of special watch or lock-up [*Id.*]. According to the testimony of Lieutenant Jeffrey Rickabaugh, Samantha asked him to place her in the restricted housing unit ("RHU"), but he advised her that he could not "as a matter of policy and actually as a matter of law, lock somebody up because they want to go to the hole" [Doc 57-7 at 5]. He further testified that after refusing her request, Samantha "was stripping herself naked and running around the block" [*Id.* at 6]. An incident report was prepared by Corrections Officer Allison McNally reporting that the incident occurred at 1:32 p.m. on October 22, 2016, and that Samantha was placed on pre-hearing confinement at 1:35 p.m. [Doc. 57-1 at 6].

Rickabaugh testified at his deposition that after the incident he directed a correctional officer to put Samantha in an isolation cell (K-ISO) on suicide watch and not to move her until she was cleared by medical and mental health [Doc. 57-7 at 7-8; 9-10]. He did not alert anyone from medical, but directed the staff to make a log entry that she was not to be removed from that cell until cleared by medical and mental health [*Id.* at 9-10]. The misconduct report [Doc. 57-1 at 6] and the inmate population control sheet [Doc. 57-14 at 3] indicate that Samantha was transferred to K-ISO 2 on pre-hearing confinement ("PHC") status pending a disciplinary hearing due to misconduct.

8

On October 24, 2016, Samantha was moved from K-ISO 2 to cell K22, still on a PHC status [Doc. 57-14 at 4]. Although cell K-ISO 2 had a camera by which officers could continuously monitor its occupant [Doc. 57-11 at 13], cell K22 had no camera [Doc. 57-9 at 8]. Around 2:30 p.m., Corrections Officer Destiny Gardner checked Samantha in K22 [Doc. 57-1 at 4]. Corrections Officer Lisa Dukeman then checked on her at 2:55 p.m, and again at 3:28 p.m. [*Id.*]. At 3:58 p.m., Dukeman again checked cell K22 and discovered Samantha hanging with strips of cloth from a torn bed sheet around her neck [Doc. 57-13 at 5; Doc. 57-19 at 3]. An "all-call" was placed and corrections officers were able to remove the sheet and place her on the floor, where Dukeman began CPR and medical personnel attempted to use an AED [Doc. 57-19 at 3]. EMS arrived and continued efforts to revive her [*Id.*].

On October 24, 2016, at 4:25 p.m., Samantha Beckwith was pronounced dead in cell K22 at the BCP [Doc. 57-19 at 3]. Following an autopsy, her death was deemed a suicide [*Id.*].

## II.   Standards

### A.   Summary Judgment

Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citing *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)*; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

Rule 56(c) "'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Marten v. Godwin*, 499 F.3d 290, 295 (3d Cir. 2007) (quoting *Celotex*, 477 U.S. at 322-23). A party asserting that a fact cannot be or is genuinely disputed must support the assertion by either citing to particular parts of materials in the record or by showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c).

Once the moving party satisfies its burden under Rule 56(c) that no genuine issue of material fact exists, the burden shifts to the nonmoving party, who must go beyond his or her pleadings and designate specific facts by the use of affidavits, depositions, admissions or answers to interrogatories showing that there is a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 324. The nonmoving party cannot defeat a well-supported motion for summary judgment by simply reasserting unsupported factual allegations contained in his or her pleadings. *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989). However, in deciding a Rule 56 summary judgment motion, the court must view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences and resolve all doubts in its favor. *Woodside v. Sch. Dist. of Phila. Bd. of Educ.*, 248 F.3d 129, 130 (3d Cir. 2001). Finally, the court must not engage in credibility determinations at the summary judgment stage. *Simpson v. Kay Jewelers, Div. of Sterling, Inc.,* 142 F.3d 639, 643 n.3 (3d Cir. 1998).

**B.    § 1983**

In order to state a viable claim under 42 U.S.C. § 1983, a plaintiff must allege: (1) the violation of a right secured by the Constitution and laws of the United States; and, (2) that the

alleged deprivation was committed by a person acting under color of state law.  *West v. Atkins*, 487 U.S. 42, 48 (1988).

Here, the amended complaint asserts § 1983 claims under the Fourteenth Amendment against each of the County Defendants (Counts I-III) and PrimeCare (Count IV), alleging that all were deliberately indifferent to Samantha Beckwith's particular vulnerability to suicide as a pretrial detainee at the Blair County Prison.[6]

The Eighth Amendment to the United States Constitution proscribes "cruel and unusual punishment.  Deliberate indifference to a prisoner's serious medical needs constitutes the "unnecessary and wanton infliction of pain" and states a cause of action under § 1983.  *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976).  A "particular vulnerability to suicide" is one type of "serious medical need" to which prison officials may not be deliberately indifferent.  *Palakovic v. Wetzel*, 854 F.3d 209, 222 (3d Cir. 2017).

When, as here, a plaintiff seeks to hold prison officials liable for failing to prevent a detainee's suicide, a pre-trial detainee may bring a claim under the Due Process Clause of the Fourteenth Amendment that is essentially equivalent to the claim that a convicted inmate may bring under the Eighth Amendment.  Thus, whether a pre-trial detainee or a convicted prisoner, a plaintiff must show: (1) that the individual had a particular vulnerability to suicide, meaning that there was a "strong likelihood, rather than a mere possibility," that a suicide would be attempted; (2) that the prison official knew or should have known of the individual's particular vulnerability;

---

[6] The amended complaint asserts violations of Samantha Beckwith's rights under the Eighth and Fourteenth Amendments against Blair County, and under the Fourth, Eighth and Fourteenth Amendments against Johnston, Pollock and PrimeCare.  As noted, Judge Gibson previously dismissed the Fourth Amendment claim against PrimeCare [Doc. 24].  At oral argument, Plaintiff's counsel clarified that he was proceeding under § 1983 on the Fourteenth Amendment claims only, and conceded any Fourth and Eighth Amendment claims.

and, (3) that the official acted with reckless or deliberate indifference, meaning something beyond mere negligence, to the individual's particular vulnerability. *Palakovic*, 854 F.3d at 223–24; *see also Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1023 (3d Cir. 1991).

### C.    Municipal Liability

"Municipalities and other local government units [are] to be included among those persons to whom § 1983 applies." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).  However, municipal liability cannot be predicated on a theory of *respondeat superior* or vicarious liability. *Monell*, 436 U.S. at 693–94.   Rather, a municipality is liable under § 1983 only when a plaintiff can demonstrate that the municipality itself, through the implementation of a municipal policy or custom, causes a constitutional violation.  *Id.* at 691-95.

Thus, a municipality may only be held liable under §1983 when an alleged violation is attributable to the enforcement of a municipal policy, practice, or decision of a final municipal policymaker.  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 122–23 (1988).  Liability will be imposed when the policy or custom itself violates the Constitution or when the policy or custom, while not unconstitutional itself, is the "moving force" behind the constitutional tort of one its employees. *Polk County v. Dodson*, 454 U.S. 312, 326 (1981).

Private corporations providing medical services on a contract basis with prisons are state actors under §1983, and may be liable for constitutional violations under the same standards applicable to the municipality.  *See, e.g., Natale v. Camden Co. Correctional Facility*, 318 F.3d 575, 582 (3d. Cir. 2003).  Thus, in order to state a claim against a private corporation providing medical services to detainees at a prison, a plaintiff must allege a policy or custom that resulted in the alleged constitutional violation at issue. *Palakovic*, 854 F.3d at 232.

III.   **Analysis**

A.   <u>**PrimeCare's Motion for Summary Judgment**</u> [Doc. 53]

Plaintiff's amended complaint asserts five causes of action against PrimeCare: one under § 1983 (Count IV) and four alleging violations of Pennsylvania state law (Counts V-VIII). PrimeCare sought judgment as a matter of law on the § 1983 claim, and dismissal of the state law counts for lack of subject matter jurisdiction in the event that summary judgment would have been granted on the § 1983 claim.

1.   <u>Constitutional Violation</u>

PrimeCare first argued that it is entitled to summary judgment because Plaintiff cannot demonstrate a violation of Samantha Beckwith's constitutional rights. Specifically, PrimeCare contended that Plaintiff has not produced sufficient evidence by which a jury reasonably could find that it was deliberately indifferent to Samantha's particular vulnerability to suicide, but, at best, produced evidence by which a juror could find mere negligence.

As previously noted, in order to hold prison officials liable for failing to prevent a detainee's suicide, a plaintiff must show: (1) that the individual had a particular vulnerability to suicide, meaning that there was a "strong likelihood, rather than a mere possibility," that a suicide would be attempted; (2) that the prison official knew or should have known of the individual's particular vulnerability; and, (3) that the official acted with reckless or deliberate indifference, meaning something beyond mere negligence, to the individual's particular vulnerability. *Palakovic*, 854 F.3d at 223–24.

Here, there are genuine issues of material fact as to each of these three elements. First, there is sufficient record evidence by which a reasonable juror could find that Samantha had a

13

particular vulnerability to suicide.   The requirement of a "particular vulnerability to suicide" speaks to the degree of risk inherent in the detainee's condition, and there must be "a strong likelihood, rather than a mere possibility, that self-inflicted harm will occur." *Colburn*, 946 F.2d at 1024.   A particular individual's vulnerability to suicide must be assessed based on the totality of the facts presented. *Palakovic*, 854 F.3d 209, 230 (3d Cir. 2017).

Here, the totality of the facts presented shows that Samantha had a long and well-documented history of mental health issues, that she struggled with drug and alcohol addiction, that she was erratic and impulsive, and that she had past suicide attempts.   As to past suicide attempts, PrimeCare chart notes show that Samantha reported to Simmers on January 22, 2015, that she had tried to hang herself with a sheet from her bunk in her cell in the BCP [Doc. 60-1 at 32].   In addition, in a suicide risk evaluation done in August of 2013, Simmers noted that Samantha had reported a prior suicide attempt with a razor blade at age 13, and that a family member had reported another suicide attempt one week before intake [Doc. 60-1 at 37].   The Court is satisfied that there is sufficient evidence in the summary judgment record by which a reasonable juror could conclude that Samantha had a particular vulnerability to suicide, such that the risk went beyond mere possibility to a strong likelihood that self-inflicted harm could occur.

Likewise, there is sufficient record evidence by which a reasonable juror could find that PrimeCare knew or should have known of Samantha's particular vulnerability to suicide. Custodians have been found to "know" of a particular vulnerability to suicide when they have had actual knowledge of an obviously serious suicide threat, a history of suicide attempts, or a psychiatric diagnosis identifying suicidal propensities. *Colburn*, 946 F.2d at 1025 n. 1.

Here, the record evidence indicates that Samantha Beckwith was no stranger to PrimeCare's staff at the BCP.   Prison mental health records document her mental health history,

the multiple suicide watches initiated at BCP over the course of her previous incarcerations, her prior reported suicide attempts, including one reported attempt in her cell at the BCP in 2015, and her prior evaluations by PrimeCare staff noting her suicide risks.  Moreover, while Simmers declined to put Samantha on suicide watch after evaluating her on multiple occasions during her last incarceration at BCP, Lieutenant Rickabaugh testified that he did put Samantha on suicide watch two days before her death after witnessing her erratic behavior [Doc. 60-1 at 89-92]. Although PrimeCare disputes whether Rickabaugh actually did place Samantha on suicide watch, pointing to documents indicating that she was transferred to K-ISO 2 on pre-hearing confinement ("PHC") status pending a disciplinary hearing due to her misconduct rather than on a suicide watch, Rickabaugh himself testified that he did put her on suicide watch, and this dispute creates a triable issue of fact to be determined by a jury.

Finally, the Court finds that there is sufficient record evidence by which a reasonable juror could find that PrimeCare acted with deliberate or reckless indifference to Samantha Beckwith's particular vulnerability to suicide.  As noted, deliberate or reckless indifference requires a level of culpability higher than a negligent failure to protect from self-inflicted harm.  *Colburn*, 946 F.2d at 1024.  Here, PrimeCare argued that there is insufficient evidence to create a genuine issue of fact as to whether it acted with that heightened degree of culpability.  PrimeCare notes that at no time during the eight evaluations of Samantha conducted by Simmers during her incarceration did Simmers, in her judgment, believe Samantha to be suicidal.  Although Simmers noted Samantha's requests for medication, as well as symptoms of anxiety and depression, she indicated that it was difficult to differentiate her mental health symptoms from symptoms of withdrawal.  As a result, Simmers declined to schedule an appointment with a psychiatrist until after Samantha detoxed. PrimeCare contended that in utilizing her judgment in this manner, Simmers could, at worst, be

determined to have been negligent, rather than to have acted with reckless or deliberate indifference.

However, the Court believes that the question of whether Simmers' decision, which Plaintiff alleges was dictated by a policy or custom of PrimeCare, which will be discussed in more detail in the following section, was merely negligent or the result of deliberate or reckless indifference, is a question of fact for a jury to determine. As will be discussed, both of Plaintiff's experts, Erik J. Roskes, M.D. and John Dale Dunn, M.D., J.D., criticized Simmers' decision not to schedule a psychiatric evaluation until after Samantha completed withdrawal, and the Court must view that testimony in a light most favorable to Plaintiff at the this stage of the proceedings. Moreover, the Court cannot engage in credibility determinations at the summary judgment stage. *Simpson*, 142 F.3d at 643 n.3 .

The Court is satisfied that there is sufficient evidence in the summary judgment record by which a reasonable juror could conclude that PrimeCare acted with deliberate or reckless indifference to Samantha Beckwith's particular vulnerability to suicide.   Because there is a triable issue of fact as to whether a constitutional violation occurred, summary judgment is not appropriate on PrimeCare's asserted ground that Plaintiff cannot demonstrate a violation of Samantha's constitutional rights.

        2.      <u>Custom, Policy, Practice</u>

PrimeCare next argued that it is entitled to summary judgment on Plaintiff's § 1983 claim because the record is devoid of evidence of any deficient policy, practice or custom on the part of PrimeCare that resulted in the alleged constitutional violation.   PrimeCare notes that their Suicide

Prevention Policy [Doc. 57-4] is based on National Commission of Correctional Healthcare standards and is reviewed on an annual basis.

As noted, municipal liability arises when a governmental entity causes an employee to violate another's constitutional rights by an official custom or policy. *See Monell*, 436 U.S. at 690-94. To establish liability, a plaintiff must identify the challenged policy or custom, attribute it to the municipality itself, and show a causal link between the execution of the policy or custom and the injury suffered. *Losch v. Borough of Parkesburg*, 736 F.2d 903, 910 (3d Cir. 1984).

Here, Plaintiff has identified several policies or customs attributable to PrimeCare that resulted in the alleged constitutional violation of deliberate indifference to Samantha Beckwith's particular vulnerability to suicide: (1) PrimeCare's policy or custom of prohibiting psychiatric treatment until after an inmate completes drug or alcohol detoxification; (2) a deficiency in the PrimeCare policy which did not provide a mechanism for adequate communication between corrections staff and medical staff when corrections staff place an inmate on suicide watch; (3) a deficiency in the PrimeCare policy which allows corrections staff to remove an inmate from suicide watch without first being evaluated by a mental health professional; and, (4) a failure to train.

The Court finds that there is sufficient record evidence by which a reasonable juror could conclude that PrimeCare had a custom or policy of prohibiting psychiatric treatment until after the completion of drug or alcohol withdrawal, and that this custom or policy was a "moving force," *see Dodson*, 454 U.S. at 326, in the alleged constitutional violation of deliberate indifference to a particular vulnerability to suicide. Plaintiff has presented evidence that Simmers made the decision not to schedule Samantha for a psychiatric evaluation until after she was "clean" for a month [Doc. 57-3 at 83]. The evidence presented also shows that this decision was made despite

Samantha's request for medication and Simmers' observation that Samantha was exhibiting symptoms of anxiety and depression [Doc. 57-3 at 81-83].   Simmers testified that she would not permit Samantha to undergo psychiatric treatment until she completed detox, and that she should detox for up to three or four weeks before she could seek such treatment [Doc. 60-1 at 86-87].

Plaintiff asserts that Simmers' was acting pursuant to a custom or policy of PrimeCare prohibiting psychiatric treatment during withdrawal.  In reply, PrimeCare points to the testimony of its CEO, Thomas Weber, who testified that PrimeCare had no such custom or policy [Doc. 63-2 at 10].  Dr. Dunn, however, testified at his deposition that he believes that Simmers' decision was made in reliance on a PrimeCare policy that prevented treatment until after detox: "she had a rote thing that I saw in some of the records that . . . she had to be detoxed and had to be clean." [Doc. 60-1 86-87].

A custom may be formed when the "'practices of . . . [are] so permanent and well settled' as to virtually constitute law." *Andrews v. City of Phila.*, 895 F.2d 1469, 1480 (3d Cir. 1990) (quoting *Monell*, 436 U.S. at 691).   The Court believes that the evidence presented creates triable issues of fact for the jury as to whether Simmers acted pursuant to a PrimeCare custom or policy prohibiting psychiatric treatment until completion of withdrawal, and as to whether that custom or policy resulted in the constitutional violation alleged.  Accordingly, it is not necessary for the Court to address the additional customs or policies identified by Plaintiff, as summary judgment in favor of PrimeCare is not appropriate on Plaintiff's § 1983 claim.

### 3.    State Law Claims

Plaintiff's amended complaint also raises survival action and wrongful death claims for professional and corporate negligence against PrimeCare under Pennsylvania state law (Counts V-

VIII) [Doc. 11].   PrimeCare argues that the Court should decline to exercise supplemental jurisdiction over these claims and that they should be remanded to state court due to a lack of subject matter jurisdiction.

28 U.S.C. § 1367(a) provides that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy."  Pursuant to § 1367(c)(3), a court may decline to exercise supplemental jurisdiction over a claim if the district court has dismissed all claims over which it has original jurisdiction.

Here, the Court has original jurisdiction over Plaintiff's § 1983 claim against PrimeCare, and supplemental jurisdiction over the related state law claims under § 1367(a).   PrimeCare's argument that the state law claims should be remanded was predicated on its position that Plaintiff has failed to demonstrate a federal claim against it.  However, because the Court has found that PrimeCare is not entitled to summary judgment on Plaintiff's § 1983 claim, and otherwise there are no compelling reasons for the Court to decline supplemental jurisdiction over the related state law claims, *see* 28 U.S.C. § 1367(c)(4), PrimeCare's request to remand the state law claims will be denied.

**B.     County Defendants' Motion for Summary Judgment [Doc. 56]**

Plaintiff's amended complaint asserts § 1983 claims against Blair County (Count I), Warden Johnston (Count II) and Deputy Warden Pollock (Count III).   All three defendants have moved for judgment as a matter of law on Plaintiff's § 1983 claims on the ground that Plaintiff has failed to produce evidence inferring that any Blair County policymakers acted with deliberate

indifference, and failed to produce evidence of a municipal policy causing the deprivation of Samantha Beckwith's rights.

      1.     Policy, Practice or Custom

As an initial matter, as the Court found with regard to Defendant PrimeCare, the Court likewise finds that there is sufficient evidence in the summary judgment record by which a reasonable juror could conclude that Samantha Beckwith had a particular vulnerability to suicide, and by which a reasonable juror could find that the County Defendants knew or should have known of that particular vulnerability.

The evidence presented shows that Samantha had been incarcerated at BCP on multiple occasions, that she engaged in erratic behavior during the course of those incarcerations, that she faced discipline for her erratic conduct at times, that she was placed on suicide watches previously, including once by Defendant Pollack in 2015, and that she once reported attempting to commit suicide in the same cell at BCP in which she died a year later.  The record further shows that Lieutenant Rickabaugh observed her erratic behavior firsthand two days prior to her suicide, and he testified that he placed her on suicide watch at that time, and further that she should not be taken off suicide watch until after she was evaluated by a mental health professional.  The Court finds this evidence sufficient to create a triable issue as to whether the County Defendants knew or should have known that Samantha was an obvious suicide risk.

Nevertheless, the County Defendants contended that Plaintiff adduced no evidence that they acted with reckless or deliberate indifference to Samantha's serious medical need, as there is insufficient evidence of a policy or custom of the BCP that caused the alleged constitutional violation.  They argued that deliberate indifference cannot be inferred based on a pattern of

violations, as the most recent suicides at the prison had occurred in 2012 and 2009, and that Plaintiff presented no evidence to show that Samantha's suicide was caused by a deficient policy, custom or training.

In response, Plaintiff identified several policies or customs attributable to the County Defendants that resulted in the alleged constitutional violation of deliberate indifference to Samantha Beckwith's particular vulnerability to suicide: (1) a deficiency in the BCP's suicide prevention policy which authorized corrections officers to remove a detainee from suicide watch without a mental health evaluation; (2) a deficiency in the policy which did not provide a proper mechanism for communication between corrections staff and medical staff regarding a detainee's suicide watch status; and, (3) a custom of inadequate training of county employees to communicate with medical staff regarding a detainee's suicide watch status.

The Court finds that there is sufficient record evidence by which a reasonable juror could conclude that the County Defendants had a deficient policy which permitted corrections officers to remove a detainee from suicide watch without a mental health evaluation, and did not provide for clear communication between corrections officers and medical staff, and that this policy was a "moving force," *see Dodson*, 454 U.S. at 326, in the alleged constitutional violation of deliberate indifference to Samantha Beckwith's particular vulnerability to suicide.

Viewing the evidence in a light most favorable to Plaintiff, as the Court must do at this stage, Plaintiff has presented evidence that the BCP suicide prevention policy permits corrections officers to remove inmates from suicide watch without an evaluation from a psychiatrist.  While the policy indicates it is "preferable" for a licensed mental health professional to modify or discontinue a suicide watch, it is not mandatory, and, in this instance, corrections officers did

remove Samantha from suicide watch by moving her from the isolation cell to cell K22 without a psychiatric evaluation.

Although Defendants contend that the records do not show that Samantha was on suicide watch when she was moved, but instead indicate that she was on PHC status, Rickabaugh testified that he did place her on suicide watch and directed staff that she should not be removed until she was seen by a psychiatrist [Doc. 60-1 at 89-92]. He did not, however, alert anyone on the medical staff that he placed her on suicide watch [Doc. 57-7 at 9-10]. Again, this dispute creates a triable issue of fact for the jury, not only as to whether the policy was deficient for allowing for the removal of a detainee from suicide watch prior to a mental health evaluation, but also as to whether the policy did not provide for adequate communication between corrections staff and medical staff when corrections staff place an individual on suicide watch. Moreover, a reasonable juror could consider the failure to record Rickabaugh's placement of Samantha on suicide watch as evidence of deliberate or reckless indifference to her particular vulnerability to suicide.

Plaintiff has also presented testimony from Dr. Roskes criticizing the BCP policy for failing to provide for direct communication from corrections staff to the medical staff [Doc. 60-1 at 84]. The credibility and weight to be given to that testimony is a jury matter, not for the Court on summary judgment.

The Court believes that the evidence presented creates triable issues of fact for the jury as to whether the BCP suicide prevention policy is deficient as to permitting corrections staff to remove a detainee from suicide watch without being evaluated by a mental health professional, and/or as to not providing a mechanism for communication from corrections staff to medical staff, and as to whether those deficiencies resulted in the constitutional violation alleged. Accordingly, it is not necessary for the Court to address any of Plaintiff's remaining allegations as to deficient

training, as summary judgment in favor of the County Defendants otherwise is not appropriate on Plaintiff's § 1983 claim.

        2.      <u>Supervisory Liability</u>

The County Defendants next argued that there are insufficient allegations of personal involvement by either Warden Johnston or Deputy Warden Pollock. They contended that Johnston had no personal involvement in Samantha Beckwith's detention, and Pollock only met her once to discuss her request to be transferred to Allegheny County Jail.

It is well-settled that "liability in a civil rights action pursuant to 42 U.S.C. § 1983 cannot be imposed on a supervisor on the basis of respondeat superior, *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir.1988), and liability cannot be imposed absent personal involvement in the alleged actions, *see Rizzo v. Goode*, 423 U.S. 362, 375–77 (1976); *Chinchello v. Fenton*, 805 F.2d 126, 133–34 (3d Cir.1986)." *Jordan v. Cicchi*, 617 F. App'x 153, 156–57 (3d Cir. 2015). Additionally, a supervisory defendant can be held liable if he or she played an "affirmative part" in the complained-of misconduct. *See Chinchello*, 805 F.2d at 133. In this regard, the Third Circuit Court of Appeals has stated that "a supervisor may be personally liable ... if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Pet. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004).

However, it also has been long established that "a supervisor may be liable under § 1983 if he or she implements a policy or practice that creates an unreasonable risk of a constitutional violation on the part of the subordinate and the supervisor's failure to change the policy or employ corrective practices is a cause of this unconstitutional conduct." *Argueta v. United States*

*Immigration & Customs Enforcement*, 643 F.3d 60, 72 (3d Cir.2011) (*citing Brown v. Muhlenberg Township*, 269 F.3d 205, 216 (3d Cir.2001).

The Court is satisfied that there is sufficient evidence in the summary judgment record by which a reasonable juror could conclude that either or both Defendants Johnston and Pollock may be liable for the implementation of a policy or practice that created an unreasonable risk of the constitutional violation alleged in this case.    Accordingly, summary judgment in favor of Defendant Johnston or Pollock is not appropriate.

## IV.    Conclusion

Rule 56(c) mandates the entry of summary judgment only against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case. *Marten*, 499 F.3d at 295.  An issue of material fact is in genuine dispute if the evidence is such that a reasonable jury could decide it in favor of the nonmoving party. *Anderson*, 477 U.S. at 248.

Here, there are genuine issues of material fact as to each essential element of Plaintiff's Fourteenth Amendment claim against each Defendant for failing to prevent Samantha Beckwith's suicide.   Plaintiff has pointed to evidence in the record sufficient to go to a jury as to whether Samantha had a particular vulnerability to suicide, whether Prime Care and/or prison officials knew or should have known of her particular vulnerability, and whether PrimeCare staff and/or prison officials acted with reckless or deliberate indifference to her particular vulnerability. *Palakovic*, 854 at 223–24.

Moreover, there are genuine issues of material fact sufficient to overcome summary judgment as to whether a policy, practice or custom of PrimeCare and/or BCP caused the deprivation of Samantha Beckwith's constitutional rights, and by which a jury could find that

Warden Johnston and Deputy Warden Pollock implemented a policy or practice creating an unreasonable risk of the constitutional violation alleged, and that their failure to change the policy or employ corrective practices caused the unconstitutional conduct.

Viewing the facts in the light most favorable to Plaintiff as nonmoving party, and drawing all reasonable inferences and resolving all doubts in Plaintiff's favor, the Court finds that genuine issues of material fact preclude judgment as a matter of law in favor of any Defendant in this case, and both motions for summary judgment therefore have been denied.

Dated: January 28, 2022

_____
Stephanie L. Haines
United States District Judge